UNITED STATES v. CERTAIN LANDS IN TOWN OF JAMESTOWN, R. I.

In re NEWLIN et al.

(Circuit Court, D. Rhode Island. April 22, 1899.)

No. 2,570.

1. EMINENT DOMAIN—RIGHT TO COMPENSATION—TAKING OF PROPERTY.
    That the erection and use of a fortification by the United States interferes with the purpose a neighboring landowner had in view in purchasing and improving his property, or even impairs its value, does not constitute a taking of such property which entitles him to compensation.

2. SAME—INJURY TO PROPERTY NOT TAKEN.
    In determining whether the condemnation of property for a public use will inflict legal injury upon other property owners, such as to entitle them to compensation, it must be assumed that the lands taken will be applied to the use for which they are condemned.

3. SAME—CONDITIONS IN DEED—RESTRICTIONS ON USE OF PROPERTY.

Lots on a tract of land were conveyed by deeds containing a condition prohibiting their use for certain purposes, such as for the erection and maintenance of any slaughter house, smith shop, steam engine, or distillery, brewery, or saloon, etc., and providing that such condition might be enforced by action by the owner of any other lot on the tract. Certain of such lots were condemned by the United States as a site for a seacoast fortification. *Held*, that the possibility that the government might in the future erect and maintain a smith shop or steam engine or other like structure on the property did not constitute a present invasion of any rights of other lot owners, whose property was not taken, which entitled them to compensation.

4. SAME.

Such restrictive conditions in deeds for the benefit of other lot owners cannot be construed as intended to apply to the United States in case it should be deemed necessary to appropriate any of the property for purposes of national defense or other public use, but only to the use of the property by private individuals for private purposes, as is indicated by the provisions giving other lot owners a right of action for their enforcement.

5. SAME.

Semble, the rule of law that merely incidental injury to property arising from the occupation and use of the property of another by the state or United States for public purposes does not constitute a "taking" of the property so incidentally injured, which entitles the owner to compensation, cannot be avoided by private covenants, so as to impose an additional burden upon the public in the exercise of the right of eminent domain.

6. SAME—EASEMENTS.

Where the proprietor of a tract of land, which was subdivided and sold to different purchasers, dedicated certain portions for the common use of all owners of other parts of the tract, such owners have an easement in the land so dedicated, which entitles them to compensation on its condemnation by the United States for a use which is inconsistent with the continuance of such easement.

Proceedings by the United States for the condemnation of lands as a site for fortifications for seacoast defenses. On motion to dismiss claims for damages and on demurrer to amended claims.

Charles A. Wilson, U. S. Dist. Atty., for the United States.
William P. Sheffield, Jr., and Clarke Burdick, for claimants.

## On Motion to Dismiss.

BROWN, District Judge. That the erection and use of a fortification for coast defense are considered by the owner of a summer residence located upon neighboring lands, not taken for the public use, "to defeat much of the purpose he had in view in the purchase thereof, and in making his erections and improvements thereon," or even that the value of his estate is impaired thereby, gives him no right to compensation. Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a "taking," within the meaning of the constitutional provision for compensation. Northern Transp. Co. v. City of Chicago, 99 U. S. 635, 642, 25 L. Ed. 336; Gibson v. U. S., 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Meyer v. City of Richmond, 172 U. S. 82, 19 Sup. Ct. 106, 43 L. Ed. 374. Therefore the only grounds for compensa-

tion, set forth in the claims of these persons whose lands have not been taken, that require further consideration, are the alleged appropriation or destruction of certain rights to use and restrain the use of the lands taken. The allegations as to the possession of such rights, however, are too general, and may involve conclusions of law.

The objection that there is not properly on the record any legal right in the lands taken is well grounded. It is a familiar rule of pleading that the commencement of particular estates must be shown. Steph. Pl. § 308; 1 Chit. Pl. § 504.

Before proceeding to decide whether the condemnation for the purposes of coast defense necessarily involves a taking or destruction of rights of a certain class, and whether compensation would be due therefor, we should first require proper allegations of the existence and origin of these rights. Upon these, accompanied by proper reference to the deeds, the legal sufficiency of the titles may be determined as a preliminary question.

Though the claims are imperfect, an opportunity should be given to amend by striking out such parts as relate to compensation for damages merely consequential to the public use and by inserting proper allegations of title. Therefore the motion to dismiss will be held, and leave is granted to amend within 20 days.

### On Demurrer to Claims.

#### (January 6, 1902.)

No land of these claimants is actually taken by the decree of condemnation. Nor do their lands adjoin the lands taken by the United States. The claimants are owners of lots on that large tract at the southern end of Conanicut Island, at the entrance of Narragansett Bay, known and platted as "Ocean Highlands." Many lots on this plat have been sold by the Ocean Highland Company subject to restrictions or conditions, the design whereof is to make every portion of Ocean Highlands subject thereto for the benefit of every other portion. Certain lots subject to these restrictions, and belonging to other persons, have been condemned by the United States for "the location, construction, and prosecution of works for fortifications and coast defense," otherwise described as "military uses."

The claimants first assert that the taking of these lands has destroyed the rights to restrict their use, and that these rights of restriction are appurtenant to the estates of the claimants as "negative easements." The claimants next contend that the destruction of these "negative easements" is a taking of their property by the United States, and that they are entitled to compensation therefor. For the United States it is contended that these rights are not taken, and that the claimants are not entitled to compensation.

The restrictive provision contained in the deeds of part of the land actually taken is as follows:

"But this deed is on condition that no slaughter house, smith shop, steam engine, furnace, forge, bone-boiling establishment, iron or brass foundry, no manufactory of chemicals of any description, of gas, soap, fish guano, fish oil, kerosene, or other oil, no brewery, distillery, bar, ale house, drinking saloon, or other place for the manufacture, compounding, or selling of any

kind of intoxicating liquors, in any manner or form, shall ever be erected, located, used, or suffered in or upon any part of said granted land, and that no other noxious, dangerous, or offensive trade or business whatever shall ever be done, carried on, or permitted in or upon said land or any part thereof, with the understanding, however, that this shall not exclude from said land any invention, apparatus, or machine appurtenant to a dwelling house, for lighting or warming the same or supplying the same with water; and said conditions may be at any time enforced, by action, injunction, or otherwise, by said grantor, its successors and assigns, against said grantee, and his heirs and assigns, forever, and also by the owner or owners, occupant or occupants, for the time being, of any portion of said Highlands, on the said plat thereof, against any owner or owners, occupant or occupants, for the time being, of said granted land, or of any part thereof, forever; the design being to have the conditions hereof in every deed given by said grantor in the premises, and make every portion of said Ocean Highlands subject to said condition for the benefit of every other portion thereof, forever."

Other provisions except from these conditions certain portions of the tract, with which we are not concerned, as well as "every part wheresoever hereafter occupied by a hotel in actual use as a hotel, and large enough for the commodious entertainment of at least fifty guests."

In considering whether there is a taking of any rights of the claimants, we must refer to the purpose for which the lands subject to these restrictions were condemned, to wit, "the location, construction, and prosecution of works for fortifications and coast defense." It must be assumed that the lands taken will be applied to that public use, which in this case is the basis of the right to condemn. No weight can be given to the claimants' contention that, if the United States should abandon its use of the land taken, and convey its title to private individuals, its grantees would have the right to carry on any of the offensive trades mentioned in the Highlands deed. See Railway Co. v. Doe, 114 U. S. 340, 5 Sup. Ct. 869, 29 L. Ed. 136; 10 Am. & Eng. Enc. Law (2d Ed.) 1088, 1130; Chicago, B. & Q. R. Co. v. City of Chicago, 166 U. S. 226, 249, 251, 17 Sup. Ct. 581, 41 L. Ed. 979. The proper inquiry is whether the necessary effect of the condemnation of other lands for the purpose specified was to take and destroy the restrictive rights and "negative easements" of the claimants, and whether this is a taking for which compensation must be made.

Upon first impression, it would seem that the result of this condemnation was rather to perpetuate the purpose of these restrictive conditions than to destroy it. If, appurtenant to A.'s estate, is the right to prevent the erection of a house on adjoining lands of B., the condemnation of B.'s land for a public building may destroy A.'s right to control the use of B.'s land, and in some cases be considered a taking of A.'s property. But, if B.'s land is condemned for an open park, thereby rendering it morally sure that no building will ever be erected thereon, surely the state need not pay A. for the loss of that which he has not lost, but which has been more effectually secured to him. Looking at the condition, it may be said, as a matter of common sense, that the appropriation of land to coast defense effectually prevents its use by private persons for noxious, dangerous, or offensive trade or business, for a slaughter house, brewery,

112 F.—40

distillery, bar, ale house, bone-boiling establishment, manufactory of soap, fish guano, fish oil, kerosene, or other oil; and it is safe to say that applying the land to coast defense neither necessarily nor in any probability, in these respects, destroys or impairs or "takes" the rights of restriction, or conflicts with their purpose. It is, however, conceivable that coast defense may require the erection and use of a smith shop, steam engine, furnace, forge, or iron or brass foundry.

Conceding the possibility that one of these may be erected and used by the United States upon these premises, can we say that this present possibility of a future use by the United States makes the present taking of other lands a present appropriation of the claimants' property rights? I am of the opinion that it does not. In Chicago, B. & Q. R. Co. v. City of Chicago, 166 U. S. 226, 241, 17 Sup. Ct. 581, 41 L. Ed. 979, the inquiry was "whether the necessary effect of proceedings in the court below was to appropriate to a public use any property right * * * without compensation being made or secured to the owner." If we are to inquire whether, in this case, the necessary effect of this condemnation of other lands is to expose these claimants or their successors in title to a violation of any of these conditions, the answer must be that it is certainly not a necessary effect. On the contrary, there is a very great degree of probability that none of these things will ever be done, or, if done, that the detriment therefrom will be too unsubstantial for serious consideration or for pecuniary estimation.

There are no allegations of fact upon which a finding of a probable interference with the rights of these claimants can be supported; nothing upon which an estimation of the damage which might result can be based. The United States has not sought a decree of condemnation that, either in express terms or by necessary or probable inference, imposes upon these claimants what they have a present right to forbid. But it may be said that it is the acquiring by the United States of a right to do those things, which these claimants have now a right to forbid, which in legal contemplation is the "taking," and not the subsequent doing of these things. But the right which the United States acquires is to do on the lands taken such of these things as are necessary and proper for national defense.

Have these claimants any property rights, under these deeds, to prevent such a use? Upon a fair construction of the condition in question, must we not regard it as having reference merely to the prohibition of such structures and such uses as might be made by private individuals in private business, and as having no reference whatever to such uses or structures as might be required for national defense?

The restrictive clause, after enumerating various things, says "that no other noxious, dangerous, or offensive trade or business whatever shall be done," etc. This shows the intent of the framer of the condition,—an intent which did not contemplate the contingency that at some time it might be necessary for the national government to erect and use upon one or more of these lots a smith shop, forge, furnace, steam engine, etc., for governmental purposes.

Were we dealing with a condition of a different character, such as

a building restriction appurtenant to the claimants' estates, whereby their value was greatly enhanced through the fact that light and air could not be cut off, or perhaps a fine prospect destroyed, a different question would be presented. If a claimant has a right to prevent the erection of a wall against his house, this right might equally well be invaded by the wall of a private house or the wall of a fortification. It might then be said that the claimant had an ordinary easement of light and air or of prospect over another's land,—a property right of ordinary character; that he had a right, under existing laws, to acquire such an easement by contract with his neighbor; that to destroy it was to take it for public use. But the condition now before us is of a different character. It does not prohibit the erection of structures as such, nor does it preserve easements of light and air or of prospect. Even a hotel is not prohibited. While we might say that the wall of a fortification was equivalent to a private wall, in cutting off air and light, we would not be justified in saying that the use by the government of any of the prohibited things for purposes of coast defense is substantially equivalent to the use of them for private purposes. This condition has no reference to structures as structures, but rather has a reference to uses of the lands on the Highlands plat, and we would be going far beyond the bounds of common experience were we to say that what the government has acquired the right to do by virtue of the public necessity for national defense is, in substance, what was contemplated and provided against by the framers of this deed.

While we might say that a wall is substantially a wall, by whomsoever erected, we cannot say that a use by the government for coast defense is substantially such a use, or involves substantially such a use, as was in the contemplation of the framers of this deed. I think this case might well be put upon the ground that the right acquired by the government does not appear to be in any substantial particular inconsistent with the provisions of this condition, or destructive thereof, and that for this reason there is no taking of the claimants' property in this particular. But if we go further, and, taking a more literal view, say that the condition does provide against exactly what the United States has now acquired the right to do, the case of the claimants is not yet clear.

If we construe this language as the equivalent of an express condition that no act or use of this character, even if necessary for national defense, shall ever be done upon these lands, would not such a construction defeat itself by requiring us to hold the condition void as against public policy? As has already been said in a former rescript in this case:

"Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a 'taking,' within the meaning of the constitutional provision for compensation. Northern Transp. Co. v. City of Chicago, 99 U. S. 635, 642, 25 L. Ed. 336; Gibson v. U. S., 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Meyer v. City of Richmond, 172 U. S. 82, 19 Sup. Ct. 106, 43 L. Ed. 374."

In Railroad Co. v. Lowe, 114 U. S. 525, 531, 5 Sup. Ct. 995, 29 L. Ed. 264, it has been said that:

The United States "possess the right of eminent domain within the states, using those terms not as expressing the ultimate dominion or title to property, but as indicating the right to take property for public uses, when needed to execute the powers conferred by the constitution, and that the general government is not dependent upon the caprice of individuals or the will of state legislatures in the acquisition of such lands as may be required for the full and effective exercise of its powers. * * *"

And at page 541, 114 U. S., at page 1004, 5 Sup. Ct., and at page 270, 29 L. Ed.:

"It is for the protection and interests of the states, their people and property, as well as for the protection and interests of the people generally of the United States, that forts, arsenals, and other buildings for public uses are constructed within the states. As instrumentalities for the execution of the powers of the general government, they are, as already said, exempt from such control of the states as would defeat or impair their use for those purposes."

There is a clear distinction between acts done by private individuals for their own benefit and working injurious consequences, and acts, perhaps equally injurious, done for a public purpose, in the execution of a public duty. See Northern Transp. Co. v. City of Chicago, 99 U. S. 635, 25 L. Ed. 336. The restrictive conditions give these claimants no right to go upon the lands taken nor to use them. The damage which may result from the use by the United States will not be the result of the taking of any part of the claimants' lands, or a direct invasion thereof, but the incidental consequence of the lawful and proper exercise of a governmental power.

But it is said these claimants have a property right which is valuable, and which is appurtenant to their estates, namely, the right to enjoin all uses of the property inconsistent with these conditions. The difficulty seems to me to be in the contention that there can be any property right whatever, springing from private grant, that the lands of another shall not be used for necessary governmental purposes. Suppose a deed to contain the condition that the grantee's property should never be used by the United States for a fort, or by the state for a state capital, armory, or school house; would not such a condition on its face be void, as against public policy? As each owner of land holds his property subject to the devesting of his title through the action of the state or of the United States, based on public necessity, can he by any means, directly or indirectly, impose upon the state or the United States the burden of compensating him for damage resulting from that public use which does not directly invade his land? If the lands on the southern end of Conanicut Island were held in fee by a number of owners, without restrictive conditions in their deeds, and the national government found it necessary to condemn any one of the estates, the adjoining owners, or those occupying other portions of the tract, could recover no damages whatever for the depreciation caused to their estates by the public use. Can it be possible that these owners, by mutual agreements or covenants that they or their successors in title will not do things which may be necessary for national defense, and by agreeing that these things are noxious and offensive to them, compel the United States to pay them for the right to do, upon lands taken, what is necessary for the protection of the nation?

If such a right can exist against the state or nation, and can be considered property, then only a mere device of conveyancing is necessary to defeat entirely the rule that depreciation of property incidental to a public use does not constitute a "taking"; for private deeds may then provide in express terms against such uses as may be necessary in case the government exercises the right of eminent domain. If these private covenants are, as against the government and state, to be recognized as property, then the government, by taking such uses, takes private property, and must make compensation.

The case for the claimants amounts to this: that, although the depreciation of the value of lands not directly encroached upon by a public use is not a taking, it nevertheless can be converted into a taking by private agreements of the owners of lots on a large plat that none of them will do things which may be necessary for coast defense. It is true that the value of lands for summer residences may be increased in value by such agreements; but does it follow that, if the state or nation desires to acquire a portion of such a tract for a public use, it can only do so by paying all the owners of a large tract for a loss of values due to the defeat of their expectation that in the use of their lands they will forever be free from annoyances such as might be caused by governmental operations?

The more reasonable view would seem to be that, if a number of summer residents choose to locate their houses upon those points of land which command the approaches by sea, they take the risk that such natural points for defense will at some time be occupied by the government; and, while they may be entitled to such increased values as result from the expectation that private persons will not carry on offensive occupations on the tract, they are not entitled to the value of a belief or expectation that the government will not apply these natural points of defense to the public use. While the owners may so contract as to control private business, and thereby increase the values of their estates, they are not entitled so to contract as to control the action of the government, or to increase the values of their lands by any expectation or belief that the government will not carry on public works in their vicinity, or that in case it does it will compensate them for the loss due to the defeat of their expectation that it would not. Let us suppose that real estate owners in a seaside town, resorted to by summer residents, should mutually covenant that no school house should be erected upon their lands, and that such provisions should in fact enhance the value of their estates; must the town, in order to procure a suitable school site, pay for the depreciation due to a necessary public use? It would seem entirely immaterial whether private persons had contracted with reference to this subject or not. Each landowner holds his estate subject to the public necessity for the exercise of the right of eminent domain for public purposes. He cannot evade this by any agreement with his neighbor, nor can his neighbor acquire a right from a private individual which imposes a new burden upon the public in the exercise of the right of eminent domain.

If the condition in question, when fairly interpreted, had any application to such uses as are incident to coast defense, the present case, wherein a great number of owners, occupying lots remote from the proposed fortifications, are making extravagant claims for damages, would be an eminently proper one for the application of the doctrine that acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, are not a taking, and that no contract of private persons can make such acts a taking, and that contracts purporting to do this are void, as against public policy.    But we do not think that this case calls for the application of this doctrine.

There is a further reason for holding that, fairly construed, these conditions have no application to a governmental use.    It is provided:

"Said conditions may be at any time enforced by action, injunction, or otherwise, by said grantor, its successors and assigns, against said grantee, and his heirs and assigns, forever, and also by the owner or owners, occupant or occupants, for the time being, of any portion of said Highlands, on the said plat thereof, against any owner or owners, occupant or occupants, for the time being, of said granted land, or of any part thereof."

Here is a right of abatement which a court of equity might well enforce against an individual, but which in its nature is inapplicable where the lands are in the control of the state or the nation, engaged in the performance of a public function.    This limitation of the remedy must be considered, for the purposes of construction, as a limitation upon the right intended to be conferred.    Parker v. Nightingale, 6 Allen, 341, 349, 83 Am. Dec. 632.

The claimants further allege that before the condemnation they had the right to the use of a portion of the condemned lands, namely, lot No. 2 on the plat of Ocean Highlands.    The origin of this right is a certain instrument under seal, bearing date October 31, 1883, constituting a declaration of trust by the Ocean Highlands Company "that it holds, and will forever hold, said parcels of shore land [one of which is said lot No. 2] in trust to permit every owner for the time being of any portion of said tract of land called 'Ocean Highlands' to go upon said respective parcels, and to pass and repass on and over the same, at pleasure."    The company reserved to itself the right to wharf out, and "to exercise, as owner of the fee thereof, any act not conflicting with the trusts hereby declared."    I am of the opinion that, by condemnation of lot No. 2, an actual easement in said lot was extinguished, and that the claimants are entitled to just compensation therefor, although there is nothing in the claims themselves to show the nature and value of this right.    But its extinction, at least, calls for the payment of nominal damages.    Johnston v. Railroad Co., 18 R. I. 642, 29 Atl. 594, 49 Am. St. Rep. 800.

It is also contended that the claimants are entitled to damages for the closing of Highland drive; but the amended claims do not allege that the claimants have any rights in said drive, or that such rights are appurtenant to their estates, or that any such rights have been taken.    These matters, therefore, are not before the court for consideration.

The claims will be dismissed, except in so far as they relate to the extinguishment of a positive easement to go upon and pass and repass in and over lot No. 2, and a decree may be entered accordingly.