734 So.2d 379 (1999)
PALM BEACH COUNTY, a political subdivision of the State of Florida, Petitioner,
v.
COVE CLUB INVESTORS LTD., d/b/a Sandalfoot Country Club, a Florida limited partnership, Respondent.
No. 90,750.
Supreme Court of Florida.
April 8, 1999.
*380 Denise D. Dytrych, County Attorney, and Leonard Berger and Barry S. Balmuth, Assistant County Attorneys, West Palm Beach, Florida, for Petitioner.
David D. Welch of Welch & Finkel, Pompano Beach, Florida, for Respondent.
James G. Yaeger, Lee County Attorney, Fort Myers, Florida, for Lee County, Amicus Curiae.
ANSTEAD, J.
We have for review the decision in Palm Beach County v. Cove Club Investors Ltd., 692 So.2d 998 (Fla. 4th DCA 1997), wherein the court certified the following as a question of great public importance:
WHETHER THE RIGHT OF A PRIVATE COUNTRY CLUB TO RECEIVE A STREAM OF INCOME FROM A MONTHLY RECREATION FEE ASSESSED AGAINST THE OWNER OF A RESIDENTIAL MOBILE HOME LOT CONSTITUTES A PROPERTY RIGHT COMPENSABLE UPON INVERSE CONDEMNATION BY THE COUNTY FOR USE OF THAT LOT IN A PUBLIC ROAD WIDENING PROJECT?
Id. at 1000. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we answer the certified question in the affirmative and hold that under the factual circumstances presented herein a covenant running with the land and requiring individual lot owners in a mobile home residence to pay monthly recreation fees for the use and enjoyment of an adjoining country club constitutes a compensable property right in favor of the country club upon the condemnation of the mobile home lot by the government.

MATERIAL FACTS AND PROCEDURE BELOW[1]
On November 21, 1989, Palm Beach County (County) purchased a residential mobile home lot from one Mary B. Herman. This lot was part of a mobile home community known as Sandalfoot Cove. The County acquired the lot through its powers of eminent domain for a road improvement project on Marina Boulevard in Palm Beach County. However, title to the property was subject to a 1969 recorded Declaration of Conditions, Covenants, Restrictions and Reservations Affecting Property Located in Sandalfoot Cove (Declaration). Under section 4(b) of the Declaration, each lot owner in the subdivision is required to *381 pay a monthly recreational fee in exchange for the right to use the recreational facilities of Sandalfoot Country Club, including a golf course and country club.[2] Pursuant to the Declaration, all restrictions contained in the Declaration, including the recreation fee assessment, were to "run with the land" for the duration of the term of the Declaration. Further, the duty to pay recreational fees was not dependent upon the lot owner's actual use of the golf course and country club facilities. In other words, the Declaration required the mobile home lot owners to pay the assessment fees regardless of whether they used the golf course or country club.
In 1994, Cove Club Investors Ltd. (Cove Club) filed an inverse condemnation action against the County alleging that the County took from it a property right in the form of the income generated from the monthly recreational fees. In a non-jury trial the trial court found that Cove Club possessed a vested, valuable property right to receive the monthly recreation fee income and that this property right had been taken by inverse condemnation, thereby entitling the country club with the right to compensation under the Florida Constitution.[3] The trial court reserved jurisdiction to determine valuation.
The Fourth District Court of Appeal affirmed the trial court's decision and found that the Declaration vested Cove Club with "a property right to a determinable monthly income from each mobile home lot owner." Cove Club Investors Ltd., 692 So.2d at 1000. Furthermore, the court held that the Declaration "created a covenant running with the land, a property right, and was more than a mere contract right." Id. The court agreed with the trial court in distinguishing this Court's decision in Board of Public Instruction v. Town of Bay Harbor Islands, 81 So.2d 637 (Fla.1955), wherein we held that building restrictions in a town subdivision plan against the erection of business buildings did not create property rights in the adjacent land owners if the lots were devoted to a public use and the restrictions violated. It noted the reasoning of the trial court that the Declaration in the instant case created a "mutual covenant running with the land between each current lot owner and Cove Club Investors, Ltd., by which the lot owner paid a determined sum and Cove Club Investors, Ltd. was obliged to operate its golf course and country club facilities for all lot owners." Cove Club Investors Ltd., 692 So.2d at 999. The district court also noted with approval the trial court's finding that because Cove Club "remained obligated to operate its facilities for all lot owners during the term of the Declaration," Palm Beach County should not be "relieved of its constitutional responsibility to pay full compensation" when it, in essence, terminated the stream of payments by its acquisition of the property for a public use. Id. at 1000.
The district court also distinguished two Third District opinions: North Dade Water Co. v. Florida State Turnpike Authority, 114 So.2d 458 (Fla. 3d DCA 1959) (holding no property right in contract between land owner and utility company despite provision in contract giving utility company exclusive rights to provide water and sewage facilities), and Division of Administration *382 v. Ely, 351 So.2d 66 (Fla. 3d DCA 1977) (holding no property right in appropriated land despite contract between mobile home park and gas company giving gas company right to supply gas to home trailers). The court held that the service contracts in both North Dade Water Co. and Ely, unlike the land covenants involved here, did not create compensable property rights or covenants running with the land. Cove Club Investors Ltd., 692 So.2d at 1000.
Finally, the court below rejected the County's argument that the judgment contravenes public policy because it places an intolerable burden on the County and the public to compensate owners of such restrictions. The district court found that "[p]ublic policy in this state requires the payment of full compensation for the taking of private property ... regardless of the sum ultimately awarded." Id. (citing Art. X, § 6, Fla. Const.).

LAW AND ANALYSIS
At issue here is whether a covenant[4] that imposes an affirmative obligation upon landowners in a mobile home community to pay monthly recreational fees constitutes a compensable property right in favor of the party whose right it is to collect such fees. Palm Beach County argues that the covenant is a restrictive covenant, which is an interest akin to that arising from contract and which does not create a compensable property right in condemnation cases. Cove Club, on the other hand, argues that the covenant is not a restrictive covenant because it imposes an affirmative duty on the lot owners to pay monthly recreational fees, which in turn entitles Cove Club to compensation for the loss of such fees upon inverse condemnation of the land subject to the covenant.
The Florida Constitution guarantees that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner." Art. X, § 6(a), Fla. Const. Generally, all property within the state, both real and personal, tangible and intangible, is subject to the government's exercise of eminent domain. See 21 Fla. Jur.2d Eminent Domain §§ 14, 15 (1998). However, under the constitution, every person holding an interest in private property is entitled to reasonable compensation in the event the property is taken. See State Road Dep't v. Chicone, 158 So.2d 753, 756 (Fla.1963) ("The whole purpose of and reason for the constitutional provisions, both state and federal, relating to compensation for property condemned is to insure that the property owner will be adequately and fairly compensated in money for that property which is taken from him. These provisions and the statutes implementing them are designed to protect the owner against confiscation of his property.").
*383 Over the years, the class of compensable property interests has been enlarged to broadly encompass leaseholds, easements, and personal property, as well as incorporeal herediments such as franchises and contracts. See 21 Fla. Jur.2d § 71, at 370. The compensability of other interests in land, however, such as restrictive covenants, has been sharply debated in a split among authorities as to whether such interests constitute a compensable property right in condemnation cases. See Board of Public Instruction v. Town of Bay Harbor Islands, 81 So.2d 637 (Fla.1955) (noting split in authority); see also 2 Julius L. Sackman, Nichols on Eminent Domain § 5.07[4] (rev.3d ed.1997) (providing majority and minority views on treatment of restrictive covenants in eminent domain cases). Some jurisdictions hold that the right to collect assessment fees constitutes a property interest compensable upon condemnation. See, e.g., Adaman Mutual Water Co. v. United States, 278 F.2d 842 (9th Cir.1960) (holding that reduction in assessment base due to condemnation of lands serviced by water irrigation company constituted compensable property right in condemnation proceedings); Harris County Flood Control District v. Glenbrook Patiohome Owners Ass'n, 933 S.W.2d 570 (Tex.App.1996) (holding that loss of assessment fees due to condemnation of patio homes constituted property right in constitutional sense).
In Adaman Mutual Water Co., the Ninth Circuit considered whether Adaman Mutual Water Company (Adaman) was entitled to compensation for the loss of prorata assessments for the operation and management of irrigation facilities upon the government's taking of a portion of the serviced area. 278 F.2d at 844. Upon acquisition of their land, landowners were required to purchase stock in Adaman for water rights and pay an assessment fee to defray the cost of installing, operating and maintaining the irrigation facilities. Adaman sought compensation for the diminution of its assessment base as a result of the condemnation of a portion of the lands in the water irrigation project. Upon review of a decision denying compensation, the Ninth Circuit held:
We think that the duty to pay assessments in the instant case is an equitable servitude or restrictive covenant binding upon any once-cultivated segment of Project land serviced by appellant [Adaman]. Appellant has lost the benefit derived from this servitude, and the loss is compensable, for the Government has destroyed an intangible right directly connected with the physical substance of the land condemned.
Id. at 846. In so holding, the court reasoned that all those who entered into the agreement with Adaman for water services were bound to pay the assessment fees and that the duty to pay such fees was "an integral facet of the overall plan" and "attached to all land to which stock was appurtenant".[5]Id. at 847.
Noting the split among the courts as to whether such restrictions constitute an interest in land, the Ninth Circuit stated:[6]
Presently, a restrictive covenant is generally deemed a property right under federal law. Chapman v. Sheridan-Wyoming Coal Co., 1950, 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393. We think it should be treated similarly in an eminent domain context where the purpose of the distinction between property interests and other rights is to differentiate losses directly connected with the land taken from losses comparatively more remote. It follows from this that any right or duty, benefit or burden, which moves or is transferred as one *384 with either the land or an estate in it must be deemed an interest in that land and compensable upon condemnation of the fee. Because the transfer of these rights and duties are subject to legal principles different from those which govern the passing of other interests, a unique, direct connection with the land is established. This connection justifies the distinction mentioned above. Accordingly, we think that under the Fifth Amendment a restrictive covenant imposing a duty which runs with the land taken constitutes a compensable interest.
Id. at 849.
Similarly, in Harris County Flood Control District, the First District Court of Appeals in Texas held that the right to collect unpaid assessment fees for the maintenance and improvement of the homes and the common areas within a patiohome community constituted property rights in favor of the patiohome owners' association. 933 S.W.2d at 575. As a condition for purchasing a residence, the declaration of covenants, conditions, and restrictions required individual owners to pay an annual assessment fee to the owners' association. Prior to suit, the Flood Control District acquired twenty homes from the individual unit owners for the purpose of a road improvement project. The trial court ruled in favor of the owners' association.
On appeal, the district court found that the covenants contained within the declaration ran with the condemned patio homes since the "covenant to pay maintenance assessments for the purpose of repairing and improving the common areas and the recreational facilities touches and concerns the land." Id. at 574-75. Moreover, the declaration "explicitly bound the purchases and their assigns" to pay such fees, and, thus, "evidenced an intent that the restrictions run with the land." Id. at 575.
In determining whether such interest constitutes a compensable property interest, the court focused on two earlier decisions which held that a restrictive covenant granting a reversionary interest in land constituted a compensable property interest "if damaged or extinguished in a condemnation proceeding," id. at 576 (citing City of Houston v. McCarthy, 464 S.W.2d 381, 387 (Tex.Civ.App.1971)), and that the obligation to pay neighborhood assessment fees creates an inherent property interest possessed by each homeowner in the subdivision. Id. at 576-77 (citing Inwood North Homeowners Ass'n v. Harris, 736 S.W.2d 632, 636 (Tex.1987)).[7] Based on McCarthy and Inwood, as well as the provision contained in the declaration, the court held that "the right to require property owners to pay assessment fees is an inherent property right owned by the remaining patiohome owners, resting in the control of and right of enforcement by Glenbrook[,]" Harris County Flood Control District, 933 S.W.2d at 577, and, therefore, concluded that this right was compensable upon condemnation of the patio homes subject to the assessment fees. Id. at 579.
The County, on the other hand, argues that under our holding in Board of Public Instruction v. Town of Bay Harbor Islands and the Third District Court of Appeal's holdings in Division of Administration v. Ely and North Dade Water Co. v. Florida State Turnpike Authority, covenants such as those involved herein do not constitute compensable property rights in the constitutional sense when such rights are condemned by a public authority.
In Bay Harbor, we analyzed whether a restrictive covenant on use, prohibiting the construction of a business building (i.e., school) in a residential area, was a property interest in favor of the surrounding landowners for which compensation must be paid when lands are acquired for a *385 public purpose.[8] In determining whether building restrictions constitute an interest in property, we noted an apparent conflict among the courts and discussed the majority and minority views on compensability of restrictive covenants. Id. at 641 (citing 2 Nichols on Eminent Domain § 5.73(3d ed.1950)). Under the majority view, a restrictive covenant
constitutes property in the constitutional sense and must be compensated for if taken. Such restrictions constitute equitable easements in the land restricted, and when such land is taken for a public use and will violate the restrictions, there is a taking of the property of the owners of the land for benefit of which the restrictions were imposed. The owners of such property cannot maintain proceedings for damages against the original owner or enforce the restrictions against the condemnor, but they are entitled to an award of compensation for the destruction of their easements.
Id. (quoting 2 Nichols on Eminent Domain § 5.73 (3d ed.1950)).
We then cited to the minority view which offers a variety of reasons for its holding that no such compensable property right exists:
It has been argued that such restrictions were not intended to apply as against public improvements;-that, since all property is held subject to the power of eminent domain, the rights of the condemner are impliedly excepted from the operation of the restrictive covenant.
It has further been held that such restrictions could not possibly inhibit the action of the sovereign because any such attempt would be void as against public policy since they constitute an attempt to prohibit the exercise of the sovereign power of eminent domain. Since the state has the power to condemn the fee prior to the imposition of a restrictive covenant, the placing of the additional burden upon the land does not create a new compensable interest.
Denial of compensation has also been justified upon the ground that such restrictions do not constitute property at all, but are merely contract rights which need not be compensated for in eminent domain. Such contract rights, it has been reasoned, are enforceable as against individuals but not as against the state.
The final argument in support of a denial of compensation in a specific case is predicated upon a construction of the particular restrictive covenant in such manner that the prospective use does not constitute a violation thereof.
Id. (quoting Nichols on Eminent Domain, supra). Although this Court recognized the majority rule, we found that the better view (and the emerging trend) is that restrictive covenants, such as building restrictions, do not constitute compensable property rights because they are not true easements and do not convey an interest in land. Id. at 642.
We concluded "that such restrictions do not vest in the owners of other lands in the *386 subdivision a property right for which compensation must be made in the event said lands are taken for and devoted to a public use even though such use is inconsistent with the use to which said lands are restricted by private agreement." Id. (construing Anderson v. Lynch, 188 Ga. 154, 3 S.E.2d 85 (1939)). Furthermore, relying on dicta in United States v. Certain Lands, 112 F. 622 (C.C.D.R.I.1899) aff'd sub nom. Wharton v. United States, 153 F. 876 (1st Cir.1907),[9] we reasoned that private landowners hold an interest in land subject to the power of the government in its exercise of eminent domain. Bay Harbor, 81 So.2d at 641. Thus, we held landowners may not contract in such a way that would control or limit the government's ability to acquire lands for public purposes or force the government to compensate them for damages resulting from a use that does not directly invade their land. Id. at 642-43. The court said:
Were we to recognize a right of compensation in such instances, it would place upon the public an intolerable burden wholly out of proportion to any conceivable benefits to those who might be entitled to compensation. In the event of the construction of a public building in a large subdivision containing many separate ownerships, a determination of the varying degrees of damage, in any, which might be claimed by the individual lot owners would present obstacles of an unwarranted nature in the exercise of the sovereign power. It would afford little, if any, actual benefit to the landowner.
Id. at 643-44 (footnote omitted). Accordingly, we held that building restrictions did not constitute a property right for which the residents of the Town of Bay Harbor Islands could be compensated. Id.
We find Bay Harbor and the cases cited therein distinguishable from the facts in the instant case for several reasons. First, Bay Harbor, Anderson[10] and Certain Lands involved restrictions which curtailed the type of use a landowner may put to his or her particular parcel of land. In contrast, the covenant in the case sub judice imposes a continuing affirmative obligation on lot owners by requiring them to pay monthly recreational fees to Cove Club.[11] Payment of the recreational fees, in turn, granted the lot owners a right of way onto Cove Club's property, as well as fulfilling the lot owners' obligation to defray the cost of maintaining and operating the golf and country club facilities. Thus, these monthly fees constitute a determinable sum to which Cove Club was entitled and said sum is directly linked to the lot owners' right to use and enjoy Cove Club's adjoining golf course and country club. We also note that under established law, as well as certain provisions within the Declaration, Cove Club has the right to assert a lien against any of the individual lot owners who fail to pay the recreation fee. See Bessemer v. Gersten, 381 So.2d 1344, 1348 (Fla.1980) (holding that owner of subdivision may enforce lien against *387 buyer of home within subdivision who failed to pay recreational fees).
Second, the policy concerns present in Bay Harbor do not exist in the instant case. Bay Harbor involved a suit by many landowners to enjoin the building of a school for fear that such use would depreciate the value of the surrounding lands. This Court contemplated the obstruction such covenants will have on the government's ability to exercise its power of eminent domain if it must succumb to the restrictions placed on the use of land. To the contrary here, however, Cove Club does not seek to enjoin the County from condemning the property for a road improvement project, nor does the covenant operate to control, limit or defeat the County's power of eminent domain. Unlike the building restriction in Bay Harbor, which precluded the erection of buildings other than for residential uses and clearly contradicted the government's intended use, the covenant in the instant case does not prevent nor limit the County from using the acquired lot for the stated purpose. Rather, the covenant merely creates a right to collect the recreational fees which in no way interferes with the County's ability to exercise its power of eminent domain. In other words, the County is not prevented from condemning the lot for a public use. Instead, "it must merely pay for it." William B. Stoebuck, Nontrespassory Takings in Eminent Domain 134 (1977).
Additionally, this Court feared that compensating each landowner in the Town of Bay Harbor Islands for varying and possibly speculative damages to their property for violation of the restriction would clearly "place upon the public an intolerable burden wholly out of proportion to any conceivable benefits to those who might be entitled to compensation" and "present obstacles of an unwarranted nature in the exercise of the sovereign power." Bay Harbor, 81 So.2d at 643-44. In marked contrast, Cove Club is but a single landowner seeking compensation based on a determinable sum for loss of income from a single lot directly related to the maintenance and operation of its property. The compensation is far from speculative and recognizing an entitlement thereto will not subject the County to an endless number of claims based on unknown and incalculable depreciation of value to land.[12]
We also find distinguishable both Division of Administration v. Ely, 351 So.2d 66 (Fla. 3d DCA 1977), and North Dade Water Co. v. Florida State Turnpike Authority, 114 So.2d 458 (Fla. 3d DCA 1959). In Ely, the issue was whether a utility company (Southeastern Propane Gas Company), which had contracted with individual owners of a mobile home park to provide liquefied petroleum gas, was entitled to compensation for the value of the property appropriated, as well as compensation for business damages, when several of the mobile home lots were acquired through condemnation proceedings. 351 So.2d at 68. Initially, the court found that the utility company was not entitled to compensation for the value of the land appropriated through eminent domain because the service and easement agreement, which *388 granted the utility company an easement upon the now condemned lands to provide services to landowners, did not create a property right which must be compensated when the right-of-way upon which the agreement related was condemned. Id. The court reasoned that "[s]uch a service and easement agreement creates an easement in gross personal to the company and not appurtenant because the easement is unsupported by another dominant estate held by the company which the easement benefited." Id. at 68-69.[13] Thus, the court held that the frustration of such an agreement did not create a compensable property interest in favor of the utility company in an eminent domain proceeding. 351 So.2d at 69.[14]
Central to the court's determination in Ely was the lack of an adjacent dominant estate to which the benefits from the exclusive easement and service agreement attached. In other words, absent a dominant estate benefitted by the easement, the utility company's interest was personal to the company, thereby creating an easement in gross. In contrast, the instant case involves the loss of affirmative obligations pursuant to a covenant running with the land as opposed to the taking of land containing merely an easement or right-of-way for the purpose of performing a service contract. Further, even if we were to apply the holding in Ely to the facts in the instant case, the result nevertheless would be different because Cove Club possesses land adjacent to the condemned property, the maintenance and operation of which is partly dependent upon the monthly recreational fees. Cove Club's property constitutes the dominant estate, to which the benefit or right to collect monthly recreational fees accrues, whereas, the lot owners hold an interest in the servient estate, upon which the burden of paying monthly fees attaches. Thus, the existence of both a dominant and servient estate, to each of which the payment of monthly assessment fees relates, distinguishes Ely from the facts in the instant case.
We also find North Dade Water Co. distinguishable from the facts in the instant case. The issue there was whether an exclusive contract between North Dade Water Company and residents in a subdivision, which granted North Dade Water Company a right of way onto the property within the subdivision to provide water and sewage services, constituted a compensable property interest upon condemnation of the property to which the contract related. North Dade Water Company argued that it was entitled to compensation on the grounds that (1) the exclusive contract right to service the condemned property created a franchise and (2) the right to *389 provide water and sewage services constituted an easement appurtenant to the condemned lands. 114 So.2d at 459-60. On appeal, the Third District Court of Appeal held that the agreement was not a franchise and that "[a] contract giving one public service corporation the exclusive privilege of maintaining its works upon a certain tract of land creates no property right that the law will recognize when enforcing the exercise of eminent domain over the same land in behalf of another corporation." Id. at 460 (quoting 2 Nichols on Eminent Domain § 5.75[4] (3d ed.1950)). In so holding, the court noted that "[i]t is settled that the incidental frustration of the performance of a contract by the public taking of certain other property is not compensable." Id. at 461. Further, the court held that North Dade Water Company's easements for the purpose of servicing the condemned properties were in gross and personal, as opposed to appurtenant, since the "easements were unsupported by a dominant estate." Id.
Similar to Ely, North Dade Water Co. involved the loss of the exclusive right to service lands subject to condemnation proceedings. Indeed, both cases noted that frustration of a right to provide services does not entitle the service provider to a compensable property interest upon the condemnation of the land to which the agreement relates. Ely, 351 So.2d at 69; North Dade Water Co., 114 So.2d at 461. While we acknowledge that the mere frustration of performance of a contract is not generally recognized as a compensable property interest, see Bay Harbor; North Dade Water Co.; Ely, we emphasize that the taking of the mobile home lot in the instant case did not frustrate Cove Club's contractual obligation. Cove Club must still maintain its property for the benefit of the remaining lot owners albeit without the recreational fees normally generated from the now condemned lot. Thus, unlike the utility company in North Dade Water Co., which based its claim upon the loss of the exclusive right to enter upon and service the condemned lands, Cove Club lost the benefit of its bargain by suffering a reduction in its assessment base without the corresponding reduction of its contractual obligation to maintain the golf course and country club. Accordingly, we find both Ely and North Dade Water Co. distinguishable from the facts in the instant case.
As one commentator has noted:
[T]he constitutional guarantee of compensation does not extend only to cases where the taking is cheap or easy. Indeed, the need for compensation is greatest where the loss is greatest. If one must make a choice between the government's convenience and the citizen's constitutional rights, the conclusion should not be much in doubt.
Stoebuck, supra, at 135. To deprive Cove Club of its right to collect recreational fees, would certainly be to deny it of a constitutional right guaranteed under article X, section 6 of the Florida Constitution. While we are mindful of the fact that parties should contract in accordance with, and with full notice of, our prior holdings, e.g., Bay Harbor, we feel that logic and reason compel us to distinguish Bay Harbor. The nature of the restriction and the policy considerations which confronted this Court in Bay Harbor simply do not exist in the instant case. To apply such a hard and fast rule in every situation would ignore the compelling factors and policy concerns inherent in a particular case and could very well lead to an unconstitutional and unjust result.
Where, as here, the assessment fees are mandatory and run with the individual land within the residential community, the right to collect such fees clearly falls into the category of a property right.[15] *390 Moreover, given article X, section 6 of the constitution, this right should be compensated for if the lands to which the assessment fees relate are condemned during the government's exercise of eminent domain. We emphasize, however, that while we hold that a covenant requiring landowners to pay monthly recreational fees constitutes a compensable property right in favor of the party whose right it is to receive such fees, that is not to say that all covenants are compensable in every case. Factors and concerns specific to a particular case, as well as the laws applicable to the relevant issues, should control the court's determination in satisfying the interests of justice and in reaching a just result. See Bay Harbor, 81 So.2d at 644. Indeed, "`[t]he constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness ... as it does from the technical concepts of property law.'" Southern California Edison Co. v. Bourgerie, 9 Cal.3d 169, 107 Cal.Rptr. 76, 507 P.2d 964, 968 (1973) (quoting United States v. Fuller, 409 U.S. 488, 490, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973)); see also Frank I. Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L.Rev. 1165, 1172 (1967).

CONCLUSION
In summary, we hold that the continuing right to collect monthly fees from the mobile home lot owners constitutes a vested property right in favor of Cove Club for which it must be compensated as a result of Palm Beach County's acquisition of the mobile home lot and extinguishment of the monthly payment through the exercise of eminent domain. To hold otherwise would be to deprive Cove Club of an inherent property interest without full and fair compensation as guaranteed under the Florida Constitution. Accordingly, we answer the certified question in the affirmative and, in accord with the reasoning set forth above, approve the decision of the Fourth District Court of Appeal.
It is so ordered.
HARDING, C.J., and SHAW, WELLS and PARIENTE, JJ., concur.
OVERTON, Senior Justice, dissents with an opinion.
OVERTON, Senior Justice, dissenting.
I dissent.
I find that the majority opinion will totally confuse the law of restrictive covenants and will make it almost impossible to determine when such covenants constitute a property right. In this instance, a developer, Cove Club Investors Ltd., who operates a private country club will receive an income windfall for a monthly recreation fee from the taxpayers of Palm Beach County but none of the taxpayers of Palm Beach County will be able to use the recreational facilities for which that fee is paid.
I find that this covenant was a contract right not a property right and find that this Court's decision in Board of Public Instruction v. Town of Bay Harbor Islands, 81 So.2d 637 (Fla.1955), controls this case. My view is also totally consistent with the decision of the Third District Court of Appeal in North Dade Water Co. v. Florida State Turnpike Authority, 114 So.2d 458 (Fla. 3d DCA 1959), in which the district court applied Bay Harbor and held that no property right existed from a contract between a landowner and a utility company even though there was a provision in the contract giving the utility company exclusive rights to provide water and sewage facilities to the property. See also Division of Administration v. Ely, 351 So.2d 66 (Fla. 3d DCA 1977). The majority appears to approve but distinguishes those decisions. I have a problem in the logic of distinguishing an agreement to exclusively *391 pay to one provider of utility services from an agreement to pay a provider of recreational services. Our decision in Bay Harbor controls, and the principles in North Dade and Division of Administration should be applied in this case. I, consequently, would reverse.
NOTES
[1] The following facts are taken from the district court's opinion in Palm Beach County v. Cove Club Investors, Ltd., 692 So.2d 998 (Fla. 4th DCA 1997). The parties have stipulated to most of the facts in this case.
[2] Section 4(b) of the Declaration provides, in relevant part:

(b) Each and every lot owner, by acceptance of the deed conveying title to his lot, covenants and agrees to pay to the GRANTOR, as owner and operator of the Sandalfoot Golf and Country Club, a monthly recreation fee of $15.00 per month, payable in advance on the first day of each and every month.
At the trial on the issue of condemnation, Charles Crosswhite, the general partner responsible for the operation of all activities and facilities of Sandalfoot, testified that the current recreational fee was $65.00 per month due to annual increases in the cost of living as reflected in the Consumer Price Index (CPI).
[3] Crosswhite testified that the amount due in recreational fees from the date of the taking equaled $4017.
[4] Covenants are loosely defined as "promises in conveyances or other instruments pertaining to real estate." 19 Fla. Jur.2d Deeds § 168 (1998). They are divided into two categories, real and personal, the differences in which are described as follows: "A personal covenant creates a personal obligation or right enforceable at law only between the original covenanting parties whereas a real covenant creates a servitude upon the reality for the benefit of another parcel of land. A real covenant binds the heirs and assigns of the original covenantor, while a person covenant does not." Id. § 174, at 325. The difference between the two types of covenants was also explained in Maule Industries, Inc. v. Sheffield Steel Products, Inc., 105 So.2d 798 (Fla. 3d DCA 1958):

A covenant running with the land differs from a merely personal covenant in that the former concerns the property conveyed and the occupation and enjoyment thereof, whereas the latter covenant is collateral or is not immediately concerned with the property granted. If the performance of the covenant must touch and involve the land or some right or easement annexed and appurtenant thereto, and tends necessarily to enhance the value of the property or renders it more convenient and beneficial to the owner, it is a covenant running with the land.
Id. at 801. In this case we deal solely with a covenant running with the land.
[5] The court found that the water rights and stock were made appurtenant to the land. Id.
[6] The court stated that "[b]y calling appellant's claim an equitable servitude we conclude no issue, for the courts are split as to whether such a restriction is an interest in land for purposes of compensation when the property to which it attaches is taken for public use." Id.
[7] We note that Inwood did not involve a condemnation proceeding.
[8] In that case, the Board of Public Instruction (Board) sought to erect a school within the Town of Bay Harbor Islands (Town). The Town sought an injunction permanently enjoining the Board from constructing a public school, relying on the restrictive covenants placed on the subject land which prohibited the construction of buildings for a business purpose. As a threshold matter, we emphasized that

the restrictions quoted above and with which we are concerned in this case do not fall within the category of true easements, such as the right of passage, use, or rights of light, air and view. See 18 Am.Jur., Eminent Domain, p. 786, Sections 156-158, especially Section 158. Easements such as these fall into a separate category from easements such as those we are dealing with in this case. These latter easements have been defined, and we think correctly, as negative easements or equitable servitudes. Such so-called easements are basically not easements in the strict sense of the word but are more properly classified as rights arising out of contract.
81 So.2d at 640.
[9] In Certain Lands, property acquired by the government was subject to restrictive covenants prohibiting certain noxious or offensive uses. The issue before the court was whether the government's acquisition of property for coastal defense purposes constituted a taking and, if so, whether such action amounted to a taking for which compensation must be paid. 112 F. at 625. The Circuit Court of the District of Rhode Island held that the government's intended use of the property was not inconsistent with the restrictions on the use of the condemned property. Accordingly, no taking occurred. Id. at 627. However, by way of dicta, the court also noted that such restrictive covenants are not interests in land for which compensation must be made. Id. at 630.
[10] Anderson involved restrictions limiting the lots in a subdivision to residential uses only. 3 S.E.2d at 86.
[11] See Hill v. Palm Beach Polo, Inc., 717 So.2d 1080, 1081 (Fla. 4th DCA 1998) (holding that provision in real estate development documents requiring property owners to pay monetary assessments constitutes an affirmative covenant and not a restrictive covenant).
[12] By this, we do not imply that ease of calculation of loss to one's property vests such landowner with a compensable property right. Rather, the right to compensation rests in the nature of the property interest and not its particular value. Our holding today also draws a distinction between restrictive covenants prohibiting the use of property, on the one hand, with covenants mandating an affirmative obligation, on the other. Different policy considerations and spiraling growth in Florida would appear to warrant such refinement in the treatment of restrictive covenants in eminent domain proceedings. For example, in recent years, this state has witnessed an expansion in the number of condominium, mobile home and other similar residential communities to accommodate the rising number of inhabitants. These communities offer a variety of amenities and common facilities, including golf courses, swimming pools, and country clubs. In order to defray the costs of such facilities, the right to enter upon, use and enjoy the common areas is often subject to various assessment fees directly connected to the ownership of the individual property.
[13] Easements in gross and appurtenant have been described as follows:

Whether an easement in a given case is appurtenant or in gross depends mainly on the nature of the right and the intention of the parties creating it. Similarly stated, whether an easement is appurtenant or in gross is to be determined by the intent of the parties as gathered from the language employed, considered in the light of surrounding circumstances. Again, whether an easement is appurtenant or in gross is to be determined by a fair interpretation of the grant or reservation creating the easement, aided, if necessary, by the situation of the property and the surrounding circumstances.
Easements in gross are not favored by the courts, however, and an easement will never be presumed as personal when it may fairly be construed as appurtenant to some other estate. Thus, if an easement is in its nature an appropriate and useful adjunct of the land conveyed, having in view the intention of the parties as to its use, and there is nothing to show that the parties intended it to be a mere personal right, it should be held to be an easement appurtenant and not an easement in gross. If doubt exists as to its real nature, an easement is presumed to be appurtenant and not in gross.
25 Am.Jur.2d Easements and Licenses in Real Property § 12 (1996).
[14] The court also held that the utility company was not entitled to business damages because "Southeastern Propane Gas Co. did not own or have any property interest in the condemned land as required by the statute [§ 73.071(3)(b), Fla. Stat. (1975)]." Id.
[15] We note that in a somewhat parallel context (i.e., an assertion of a property right in cash), the Supreme Court of the United States in Phillips v. Washington Legal Foundation, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), held that interest earned in an Interest on Lawyers Trust Account (IOLTA) constituted "private property" under the Fifth Amendment, which belonged to the individual clients or their attorneys. Id. at 1928.