987 So.2d 198 (2008)
Richard ESBIN, Denise Esbin, Eugene G. Kyle, III, Rachel R. Shelar, Jeffrey S. Shelar, and Cynthia Feld, Appellants,
v.
Elfriede K. ERICKSON, Lois Kinney, Eileen Majowicz, Vincent M. Semedalas, Judith Ann Semedalas, Joseph H. Bates, and Herbert Gautreaux, Appellees.
No. 3D08-101.
District Court of Appeal of Florida, Third District.
July 23, 2008.
*199 Steven M. Goldsmith, Boca Raton, De Vane and Dori and William N. De Vane, Jr., Marathon, for appellants.
Christopher B. Waldera, Marathon; Greenman, Manz & Ables and Franklin D. Greenman, Marathon; Lee Robert Rohe, Summerland Key; Cunningham Miller & Kyle and Steven T. Williams, Marathon; Robert K. Miller, Marathon; Vernis & Bowling and Scott C. Black, Marathon, for appellees.
Before GERSTEN, C.J., and SUAREZ and CORTIÑAS, JJ.
CORTIÑAS, J.
Appellants, Denise Esbin, Richard Esbin, Eugene G. Kyle, III, Rachel R. Shelar, Jeffery S. Shelar, and Cynthia Feld, seek review of the trial court's amended order granting summary judgment determining that they are not entitled to usage of a dock in their development, nor access to the easements related thereto. We affirm.
Terrence Williams (the "Developer") was the fee simple owner of Lots 15 and 16, Block 1, and Lot 10, Block 2 of Knights Key Village, a subdivision in Monroe County, Florida. Lots 15 and 16 are adjacent to Kyle Harbour and Lot 10 is separated from lots 15 and 16 by a road, Kyle Way East. Lots 10, 15, and 16 each contain two dwelling units that are maintained as individual homes. A survey dated January 16, 1989 shows the original lots, broken down according to the individual dwelling units, as 10-A, 10-B, 15-A, 15-B, 16-A, and 16-B (collectively, the "Dwelling Lots"). The survey also shows six dock *200 lots, 10-A-D, 10-B-D, 15-A-D, 15-B-D, 16-A-D, and 16-B-D (collectively, the "Dock Lots") along the waterfront between Lots 15 and 16, and the harbor.
In early 1989, the Developer recorded a Declaration of Restrictive Covenants ("Declaration") and shortly thereafter conveyed, by warranty deed, each of the six Dwelling Lots with a corresponding dock lot. As a result of this conveyance, each original transferee owned both a dwelling lot and a dock lot. Shortly after the conveyance of the properties to the original transferees, and well before the purchase of Lots 10-A and 10-B by the appellants, dock lots 10-A-D and 10-B-D, along with their corresponding easements, were transferred separately from their previously corresponding dwelling lots.[1] The Esbins and Feld are the present owners of Lot 10-A and the Shelars currently own Lot 10-B. Disputes between the appellants and several of the appellees arose after appellants acquired their respective properties and used and/or attempted to use the dock and the easements leading to the Dock Lots abutting the dock. Actions for ejectment and to quiet title were filed by several of the appellees and following various cross-motions for summary judgment, the amended order on appeal was entered.
Appellants' claims are based primarily on the language of the Declaration, which provides, in pertinent part:
C. Lots 15 and 16, Block 1, which are both located on Kyle Harbour, are equipped with wooden docks for use by all the owners of the Property[2], and which the Developer also anticipates will require maintenance from time to time in the future.
D. The Developer desires to sell each of the six (6) dwelling units on the Property to individual purchasers, and also desires by this Declaration to regulate the duties and responsibilities of the purchasers to one another for the maintenance of the commonly shared property.
Based upon the existence of the foregoing conditions, the Developer hereby undertakes and declares to each and every purchaser of the Property, or any portion of it, the following:
1. Each owner of a dwelling on the Property shall each be responsible for their own dwelling unit, Lot and Dock Lot;
....
3. In addition to the owners' liability for the expenses specified in Paragraph 1 of this Declaration, each of the owners shall be responsible for one-sixth (1/6) of any and all costs and expenses for the maintenance of the docks abutting lots 15 and 16, Block 1. Such costs and expenses shall be determined by a majority of the owners in accordance with Paragraph 4 of this Declaration. The payment and reimbursement of such costs and expenses and, where appropriate, the legal enforcement of the same, shall be administered in accordance with the procedures in Paragraph 5 of this Declaration. For purposes of this Paragraph 3, the term "maintenance" shall include, but not be limited to the repairing and replacing of the docks.
*201 Appellants argue that the court erred in construing the Declaration's language contrary to its plain meaning and contend that the Declaration requires that the Dwelling Lots remain attached to the corresponding Dock Lots. However, we find no language in the Declaration that expressly forbids the transfer of any of the Dock Lots independent from the Dwelling Lots.
It is settled by Florida case law that covenants are strictly construed in favor of the free and unrestricted use of property. Where the terms of a covenant are unambiguous, the courts will enforce such restrictions according to the intent of the parties as expressed by the clear and ordinary meaning of its terms. A covenant which is substantially ambiguous is resolved against the party claiming the right to enforce the restriction.
Norwood-Norland Homeowners' Ass'n v. Dade County, 511 So.2d 1009, 1014 (Fla. 3d DCA 1987) (citing Moore v. Stevens, 90 Fla. 879, 106 So. 901 (1925)). While the Declaration sets forth maintenance obligations with respect to the maintenance of the dock, none of which apply to appellants, and may have presumed that the owners of the Dwelling Lots would keep the Dock Lots originally transferred to them, it does not unambiguously require that the Dock Lots remain attached to the Dwelling Lots as originally paired.
Appellants further argue that, even if the original separation of dock lots 10-A-D and 10-B-D was proper, they are nonetheless entitled to use the dock access easements because Lots 10-A and 10-B are the dominant estates. Appellants cite to the warranty deeds from the Developer to the original transferees of Lots 15-A and 15-B in support of their position because the two deeds contain language specifying that each lot is subject to the dock access easement in favor of the owners of Lot 10.
After hearing arguments and reviewing briefs by the parties, the trial court found that the Dock Lots were the dominant estates. A review of the 1989 survey clearly supports this conclusion. A dominant estate is the estate that receives the benefit of an easement. See Burdine v. Sewell, 92 Fla. 375, 109 So. 648, 652 (1926). The dock access easements provide access to the Dock Lots themselves, and not to the dock, as there is no way to access the dock by land other than through one of the Dock Lots. As such, even if Lots 10-A and 10-B were the dominant estates and were therefore entitled to access the easements, they would still be unable to access the dock and harbor because the easements fall short of this destination. Although not specifically set forth in the Declaration, it is clear that the dock access easements were established with the ultimate effect of benefiting the Dock Lots. Because the Dock Lots are the dominant tenements, it follows that the dock access easements were transferred along with the sale of the individual Dock Lots. See Behm v. Saeli, 560 So.2d 431, 432 (Fla. 5th DCA 1990).
It is important to note that when appellants purchased their respective properties, the warranty deeds contained no reference to the Dock Lots nor to the dock access easements and, thus, the appellants were aware that they were solely purchasing their respective dwelling lots. While it certainly appears that the Developer originally assumed that each dwelling lot would be coupled with a corresponding dock lot, there is nothing in the Declaration that precludes the separation of a particular dock lot from the dwelling lot with which it was originally paired. Appellants' predecessors in interest willingly transferred their dock lots and the corresponding easements independent of their Dwelling Lots and we cannot now, nearly two decades *202 after their separation, undo those transfers and grant appellants rights and benefits they clearly did not purchase.
Furthermore, allowing the appellants' use of the dock without owning a dock lot would essentially infringe upon at least one dock lot owner's use of the portion of the dock abutting his or her dock lot because there is no portion of the dock in the development that is not adjacent to a dock lot. The Declaration contemplates that the owner of a dock lot has the use of the portion of the dock adjacent to his or her lot and can make improvements thereto. More specifically, the Declaration provides, in part:
Notwithstanding the restrictions imposed by this Declaration, the owner of each dwelling unit may make improvements at his own expense to that portion of the dock which is adjacent to his Dock Lot subject to the written approval of the majority of dwelling unit owners. The improvements may include, but not be limited to, ladders and davits. The individual improvements made shall solely be the property of and responsibility of the improving party.
It is apparent that the Developer intended that each dock lot owner utilize that portion of the dock adjacent to their dock lot and, as such, the Declaration did not contemplate access to the dock without ownership of a dock lot.
To the extent that the Declaration imposes requirements upon the owners of the "Property" for payment of maintenance costs associated with the dock, we also agree with the trial court that such maintenance obligations apply only to the owners of the Dock Lots and not to the appellants. We affirm on all other points.
NOTES
[1] Dock lot 10-A-D physically abuts Lot 15-A and dock lot 10-B-D physically abuts Lot 15-B.
[2] The "Property," as used in the Declaration, refers to "Lots 15 and 16, Block 1, and Lot 10, Block 2 of Knights Key Village, a Subdivision according to the Plat recorded in Plat Book 5, Page 84 of the Official Records of Monroe County, State of Florida."