# Third District Court of Appeal

## State of Florida

Opinion filed October 16, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-2116
Lower Tribunal No. 22-11625-CA-01
_____


**PAJ Investment Group, LLC,**
Appellant,

vs.

**El Lago N.W. 7th Condominium Association, Inc.,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Valerie R. Manno Schurr, Judge.

Squire, Patton, Boggs (US), LLP, and Alvin B. Davis; Rosenquest Law Firm, PA, and John B. Rosenquest, IV, for appellant.

Luks, Santaniello, Petrillo, Cohen & Peterfriend, and Edgardo Ferreyra, Luis Menendez-Aponte, and Lucas Gargaglione, for appellee.


Before LOGUE, C.J., and MILLER and GOODEN, JJ.

GOODEN, J.

PAJ Investment Group, LLC appeals an order of involuntary dismissal entered during a bench trial. PAJ maintains that the trial court erred in involuntarily dismissing the case and finding that the easements were in gross—not appurtenant. For the reasons set forth herein, we affirm.

**I.**

Frederick Mezey was a real estate developer in Miami in the late 1970s and early 1980s. Mezey was the principal and general partner in American Properties, Ltd. American Properties owned all the subject parcels of land at issue in this appeal. These parcels are located between N.W. 7th Street and the Tamiami Canal. Mezey and American Properties sought to develop this area.

El Lago N.W. 7th Condominium Association, Inc. currently operates the El Lago Condominium. The condominium is located on one of the parcels with direct access to N.W. 7th Street. PAJ Investment Group currently owns Parcels 17-21. Parcels 17-21 are located immediately north of El Lago—along and in the Tamiami Canal. The below graphic demonstrates the location of the properties:



Key Title Documents
in vicinity of
EL LAGO CONDOMINIUM, Miami, FL
prior to
Recordation of Declaration of Condominium
(ORB 11202-2092)

In January 1980, American Properties granted a 52' wide east easement and a 50' wide west easement on the sides of the El Lago property to Tamiami Sports, Inc. Tamiami Sports was a separate corporate entity established by Mezey and in which Mezey was the primary shareholder. PAJ's expert testified that, since American Properties owned all the subject properties, Mezey likely formed Tamiami Sports to hold the easements, thereby avoiding the doctrine of merger.[1]

---

[1] At that time, an easement was "extinguished through merger when ownership of the dominant and servient estates become united in one person." Lacy v. Seegers, 445 So. 2d 400, 401 (Fla. 5th DCA 1984).

3

The easements connect Parcels 17-21 with N.W. 7th Street. Nevertheless, Tamiami Sports never owned Parcels 17-21 or any adjoining property. Tamiami Sports was involuntarily dissolved in November 1983.

The easements are verbatim, except for the size and location on the property. They provide:

THIS INDENTURE, made this 11th Day of January 1980 . . .

BETWEEN        AMERICAN PROPERTIES, LTD . . . hereinafter called the GRANTOR:

AND        TAMIAMI SPORTS, INC. . . . hereinafter called the GRANTEE:

. . . Grantor has granted . . . to Grantee the use of a . . . right-of-way easement for the purpose of ingress and egress and the other purposes hereinafter set forth. . . .

It is the TRUE INTENT AND PURPOSE of these presents to convey to the Grantee the perpetual right to construct, reconstruct, inspect, enlarge, repair, maintain, remove and replace, operate or use, improve and relocate sanitary sewer lines, utility lines, surface water drainage lines, water, electric, gas, telephone, television and other utilities and facilities as well as the right to install, maintain and to post signs in, on, over, under, along, upon, through, across, above and beneath said right-of-way easement, and to construct the necessary structures incidental and necessary thereto including the right to construct, reconstruct, inspect, enlarge, repair, maintain, remove and replace, operate or use, improve and relocate such pumps for sewerage, water or other utilities and related facilities as may be

---

However, in 2024, the Legislature enacted section 704.09, Florida Statutes, thereby changing this dynamic. § 704.09, Fla. Stat. (2024). Neither party has raised any argument as to this statute.

existing within said right-of-way or as may be thereafter placed thereon by Grantor or Grantee or others within the limits of the said right-of-way, and the perpetual, but, non-exclusive right of ingress and egress.

Grantor further agrees to allow Grantee, its successors and assigns or any authorized agents or representatives thereof the reasonable right of access to and from the said easement for the purpose of exercising the rights granted but without limiting the same to the free and full rights of ingress and egress over and across said lands and other lands of the Grantor to and from said right-of-way easement in accordance with the rights herein given and the right, from time to time, to excavate existing pavement or other structures and to interrupt the access of Grantor, their assigns or successors temporarily as may be necessary during the utilization of this easement by Grantee as well as the right, from time to time, to cut, remove and keep clear any trees, undergrowth or other obstructions that may injure, endanger or interfer[e] with the construction, operation, maintenance and repair of any utility lines, signs, facilities, other accessory structures, or any other rights of Grantee hereunder.

PROVIDED, that upon the completion of any work relating to the aforesaid purposes, the Grantee shall cause all vehicles, equipment, tools and implements used in such work and all materials not incorporated therein to be removed from said lands and shall cause said lands to be left in good and proper condition.

HEREBY RESERVING to the Grantor and Grantor's heirs, executors, administrators, successors and assigns, the right to use the said lands for any purpose not inconsistent with the terms of this deed and which will not prevent easy and ready access by Grantee, its successors and assigns, the uses aforesaid.
. . . .

Shore Point, Inc., in which Mezey also had an ownership stake, was a successor in interest to American Properties. It was created to develop the El Lago Condominium. The condominium declaration was recorded in

5

September 1981—over a year after the easements were created and recorded. The declaration expressly referenced and were subject to the easements. Since inception, El Lago has used the easement areas for residential parking.

A sketch of the 1980 survey is shown below:



In the early 2000s, PAJ acquired title to Parcels 17-21 via tax deed sale. The parcels were submerged in the Tamiami Canal.[2] Although

---

[2] It appears from the record that they are submerged due to construction at Miami International Airport and overflow from the Tamiami Canal.

submerged, PAJ investigated the potential to develop Parcels 17-21. In this process, PAJ used the easements for the purpose of surveying the parcels, among other things.

PAJ subsequently sought to sell Parcels 17-21 to a developer, fill in the property, build 600 condominium units, and use the easements as permanent ingress and egress for the development. When El Lago learned of PAJ's development plans, it terminated PAJ's access. PAJ's buyer withdrew from the contract, causing PAJ pecuniary losses.

PAJ filed a declaratory action against El Lago seeking a declaration that the easements are appurtenant and seeking injunctive relief to prevent interference with the easements. PAJ sought a preliminary injunction. The trial court granted the motion finding that the easements were appurtenant and bind El Lago as the servient estate.

The case proceeded to a non-jury trial. PAJ presented testimony of its corporate representative, an expert, and submitted numerous documents into evidence. After a motion by El Lago, the trial court involuntarily dismissed the case. The trial court found that the easements were in gross. It reasoned that PAJ was not a direct successor to the corporate interest of Tamiami Sports, Tamiami Sports did not own any property, and the language

7

of the easements did not describe Parcels 17-21 or a dominant estate in any manner.

This appeal followed.

## II.

"Our review of the trial court's interpretation of the easement agreement is de novo." Five Seas Inv'rs, Inc. v. Guzman, 258 So. 3d 569, 571 (Fla. 3d DCA 2018).

## III.

The issue before this Court is whether the easements are appurtenant or in gross. PAJ maintains that the easements are appurtenant because they are perpetual, non-exclusive, granted ingress and egress, and allowed for other permissible uses, all of which would be essential to development of the property. On the other hand, El Lago contends that the easements are in gross. It focuses on the fact that Tamiami Sports did not own any property, and, therefore, the easement was not attached to an estate. It further argues that the text of the easements did not reference any dominant estate.

### A.    History of Easements

Easements date back to the Twelve Tables of Rome.[3]  Law 3, Table VII, Law of the Twelve Tables (449 B.C.).  Under the Twelve Tables, if a person had a right to proceed over another's land and the road was in disrepair, he or she could pass over another portion of the land.  Id.

Roman law later recognized *servitus*, or servitudes—rights in the land of others.  Arthur Nussbaum, The Significance of Roman Law in the History of International Law, 100 U. Pa. L. Rev. 678, 687 (1952).  "The purpose of a praedial servitude is to facilitate or make possible an owner's use of his land by means of a right of entry onto a neighboring piece of land."  Herbert Hausmaninger & Richard Gamauf, A Casebook on Roman Property Law, 244 (George A. Sheets ed., Oxford U. Press, Inc., 2012) (2003).  Under the praedial servitude, the land which benefited from the enjoyment of the right was called *praedium dominans* and the land encumbered by the right was called *praedium serviens*—the dominant and servient tenements.  4 La. Civ. L. Treatise, Predial Servitudes § 6:40 (4th ed.).

---

[3] Much of our modern property law can be traced to the Romans.  "It was the Romans who developed the conveyance of real estate by written instruments and subscribing witnesses, and passage of title by a will, also to be in writing and with subscribing witnesses."  Benjamin Palmer, An Imperishable System: What the World Owes to Roman Law, 45 A.B.A.J. 1149, 1152, 1220 (1959).

"A 'pr[a]edial servitude' is a charge on a servient estate for the benefit of a dominant estate. The benefit must be attributable to any person who may own the dominant estate at any time." 28A C.J.S. Easements § 3; see also La. Civ. Code Ann., art. 646, Revision Comments 1977. These rights ran with the land and passed to all successors in interest who owned or occupied the dominant and servient tenements. Hausmaninger & Gamauf, supra, at 244-45.

On the other hand, the servitude of *usus* or use, granted a person the right to use the land without regard to ownership. Id. This often involved the use of someone's farm. Id. These servitudes created personal rights that were extinguished upon the death of the original grantee. Id.

Many of these principles made their way into the common law. See generally Thomas J. McSweeney, Property Before Property: Romanizing the English Law of Land, 60 Buff. L. Rev. 1139 (2012); Henry of Bractton, On the Laws and Customs of England (Samuel E. Thorne, ed., c. 1250). But the characteristics of these rights often remained undefined and unclear as they contrasted with the English feudal system. W. S. Holdsworth, A History of English Law, Vo. III (1066-1485—The Medieval Common Law), 154–157 (3d. ed. 1923). Indeed, much of the law in this area developed around the law of nuisance. Id.

By the 1700s, the law of ways was well-established in England.

William Blackstone described it as:

> A fourth species of incorporeal hereditaments is that of <u>ways</u>; or the right of going over another man's ground. I speak not here of the king's highways, which lead from town to town; nor yet of common ways, leading from a village into the fields; but of private ways, in which a particular man may have an interest and a right, though another be owner of the soil. This may be granted on a special permission; as when the owner of the land <u>grants</u> to another the liberty of passing over his grounds, to go to church, to market, or the like: in which case the gift or grant is particular, and confined to the grantee alone: it dies with the person; and, if the grantee leaves the country, he cannot assign over his right to any other; nor can he justify taking another person in his company. A way may be also by <u>prescription</u>; as if all the inhabitants of such a hamlet, or all the owners and occupiers of such a farm, have immemorially used to cross such a ground, for such a particular purpose: for this immemorial usage supposes an original grant whereby a right of way thus appurtenant to land or houses may clearly be created. A right of way may also arise by act and operation of law: for, if a man grants me a piece of ground in the middle of his field, he at the same time tacitly and impliedly gives me a way to come at it; and I may cross his land for that purpose without trespass. For when the law doth given any thing to one, it giveth impliedly whatsoever is necessary for enjoying the same.

Blackstone, II Commentaries on the Laws of England, 35-36 (11th ed. 1791).

<u>See also</u> Humphry W. Woolrych, <u>A Treatise of the Law of Ways</u>, 2 (1st ed. 1834). "If a way be granted in gross, it is personal only, and cannot be assigned." <u>Ackroyd v. Smith</u>, 10 C.B. 164, 138 Eng. Rep. 68, 77 (1850). "At common law, easements in gross were strongly disfavored because they

were viewed as interfering with the free use of land." U.S. v. Blackman, 613 S.E.2d 442, 446 (Va. 2005).

After the Revolutionary War ended, many states adopted the common law of England as their own. See, e.g., Lathrop v. Deal, 801 S.E.2d 867, 871 n.9 (Ga. 2017); Porter v. State, 1 Mart. & Y. 226, 227 (Tenn. 1827). Indeed, the English common law was adopted by the Territory of Florida in 1822. Fla. Terr. Acts 1822, p. 50; see also Fla. Terr. Acts 1823, p. 111; § 2.01, Fla. Stat. (1829). This included common law concepts concerning real property. 19 Fla. Prac., Florida Real Estate § 1:1 (2024 ed.).

Many of the early cases in Florida concerned public easements. See, e.g., Dorman v. City of Jacksonville, 13 Fla. 538 (1869) (citing English common law in support); Robbins v. White, 42 So. 841 (Fla. 1907). However, the Florida Supreme Court eventually set forth the elements of an easement appurtenant:

> First, they are incorporeal; second, they are imposed upon corporeal property; third, they confer no right to a participation in the profits arising from such property; fourth, they are imposed for the benefit of corporeal property; fifth, there must be two distinct tenements—the dominant, to which the right belongs, and the servient, upon which the obligation rests.

Burdine v. Sewell, 109 So. 648, 652 (Fla. 1926) (internal citation omitted). The easement cannot exist separate from the dominant estate; the dominant estate and holder of the easement must be owned by the same party. See

12

Tampa & G.C.R. Co. v. Mulhern, 74 So. 297, 298 (Fla. 1917) ("The easements of an abutting owner cannot be reserved or conveyed, or exist separate from the property to which they pertain, so that land shall be owned by one, and the easements by another.").

These elements are still present in modern easement jurisprudence.

### B.    Appurtenant versus In Gross Easements

Under Florida law, easements are either appurtenant or in gross.  Palm Beach County v. Cove Club Inv'rs. Ltd., 734 So. 2d 379, 388 n.13 (Fla. 1999).

> Whether an easement in a given case is appurtenant or in gross depends mainly on the nature of the right and the intention of the parties creating it. Similarly stated, whether an easement is appurtenant or in gross is to be determined by the intent of the parties as gathered from the language employed, considered in the light of surrounding circumstances.

Id.  Like other legal documents, text and context are paramount to this determination.  Cf. Conage v. United States, 346 So. 3d 594, 598 (Fla. 2022); Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("Context is a primary determinant of meaning."); see also Easton v. Appler, 548 So. 2d 691, 694 (Fla. 3d DCA 1989) ("Intent is determined by the language of the granting instrument, the situation of the property, and the surrounding circumstances.").

"An easement is appurtenant when the right which it represents is attached to and belongs with some greater or superior right as a dominant

13

estate." <u>N. Dade Water Co. v. Florida State Tpk. Auth.</u>, 114 So. 2d 458, 461 (Fla. 3d DCA 1959). "The easement holder possesses the dominant tenement, while the owner of the land against which the easement exists possesses the servient tenement." <u>Dianne v. Wingate</u>, 84 So. 3d 427, 429 (Fla. 1st DCA 2012). "A dominant estate is the estate that receives the benefit of an easement." <u>Esbin v. Erickson</u>, 987 So. 2d 198, 201 (Fla. 3d DCA 2008). It is permanent and runs with the land. <u>Morris v. Winbar LLC</u>, 273 So. 3d 176, 178–79 (Fla. 1st DCA 2019).

"Since an easement appurtenant runs with the land, it can be transferred with the dominant tenement." <u>Seven Kings Holdings, Inc. v. Marina Grande Riviera Beach Condo. Ass'n, Inc.</u>, 364 So. 3d 1108, 1113 (Fla. 4th DCA 2023). It cannot be severed and separated from the dominant estate. <u>Id.</u> at 1113–14.

In contrast, "easements in gross . . . are mere personal interests in land that are not supported by a dominant estate." <u>Dunes of Seagrove Owners Ass'n, Inc. v. Dunes of Seagrove Dev., Inc.</u>, 180 So. 3d 1209, 1211 (Fla. 1st DCA 2015). They are not related to a specific adjacent parcel. These easements are personal to the holder. <u>Morris</u>, 273 So. 3d at 179. Nevertheless, easements in gross are not favored and will never be presumed. <u>Palm Beach Cnty.</u>, 734 So. 2d at 388 n.13.

14

Easements in gross often concern utilities.  See, e.g., Div. of Admin., Dept. of Transp. v. Ely, 351 So. 2d 66 (Fla. 3d DCA 1977) (liquified petroleum gas); N. Dade Water Co., 114 So. 2d at 458 (water and sewer).  Other examples include providing another beach access.  See, e.g., Dunes of Seagrove Owners Ass'n, Inc., 180 So. 3d at 1209.

### i.     The easement holder must own the dominant estate.

One of the primary characteristics of an easement appurtenant is it must attach to a dominant estate.  It cannot be separated and transferred apart therefrom.  See generally Restatement (Third) of Property: Servitudes § 5.6 (2000); Seven Kings Holdings, Inc., 364 So. 3d at 1114.

As a result, most—if not all—jurisdictions require the grantee of the easement to also own the dominant estate or come into ownership shortly thereafter.  See Jon W. Bruce & James W. Ely, Jr., The Law of Easements & Licenses in Land § 2:1 (2024) ("Both the easement and the dominant estate must be held in an identical manner in order for the easement to be appurtenant."); 3 Tiffany Real Prop. § 761 (3d ed.) ("It is obvious that the easement, to be appurtenant, must be attached to a dominant estate, and it can become legally attached only by unity of title in the same person to both the dominant estate and the easement claimed."); 28A C.J.S. Easements § 17 ("To constitute an easement appurtenant, as in the case of easements in

15

general, there must be a dominant and a servient tenement, and it can become legally attached to the dominant estate only by unity of title in the same person to both the dominant estate and the easement claimed.").

For instance, the North Carolina Supreme Court has explained:

> An easement appurtenant is incapable of existence apart from the particular land to which it is annexed, it exists only if the same person has title to the easement and the dominant estate; it must bear some relation to the use of the dominant estate, and it must agree in nature and quality to the thing to which it is claimed to be appurtenant. An easement appurtenant is incident to an estate, and inheres in the land, concerns the premises, pertains to its enjoyment, and passes with the transfer of the title to the land, including transfer by descent.

Shingleton v. State, 133 S.E.2d 183, 185–86 (N.C. 1963). Accord Brown v. Weaver-Rogers Associates, Inc., 505 S.E.2d 322, 324 (N.C. Ct. App. 1998) ("An easement appurtenant is a right to use the land of another, i.e., the servient estate, granted to one who also holds title to the land benefitted by the easement, i.e., the dominant estate."). "A landowner cannot create an easement appurtenant in a transaction with a complete stranger to the dominant estate." Town of Carrboro v. Slack, 820 S.E.2d 527, 532 (N.C. Ct. App. 2018). "Thus, to create an easement appurtenant, the transaction that creates these rights and obligations must be between the owner of the servient estate and the owner of the dominant estate." Id.

16

Other jurisdictions similarly recognize this principle. See, e.g., Hyde Rd. Dev., LLC v. Pumpkin Associates, LLC, 21 A.3d 945, 951 (Conn. App. Ct. 2011) ("[T]he express grantee of the easement appurtenant must also be the owner of the dominant estate that the easement is intended to benefit."); Olsen v. Noble, 76 S.E.2d 775, 780 (Ga. 1953); Yaali, Ltd. v. Barnes & Noble, Inc., 506 S.E.2d 116, 117–18 (Ga. 1998) ("The creation of an easement appurtenant requires that the grantee of the easement own the dominant estate, the land benefitted by the easement. This principle is known as 'unity of title.' Without unity of title, no easement appurtenant can be created."); Waller v. Hildebrecht, 128 N.E. 807, 809 (Ill. 1920) ("It is obvious that the easement, to be appurtenant, must be attached to the dominant estate, and it can become legally attached only by unity of title in the same person to both the dominant estate and the easement claimed."); Kikta v. Hughes, 766 P.2d 321, 323 (N.M. Ct. App. 1988) ("There must be unity of title in the same person to both the dominant estate and the appurtenant easement claimed."); Newman v. Michel, 688 S.E.2d 610, 616–17 (W. Va. 2009) ("The main features of an easement appurtenant are that there must be both a dominant and servient estate; the holder of the easement must own the dominant estate. . . .").

Florida does as well. See Tampa & G.C.R. Co., 74 So. at 298 ("The easements of an abutting owner cannot be reserved or conveyed, or exist separate from the property to which they pertain, so that land shall be owned by one, and the easements by another."); Dianne, 84 So. 3d at 429 ("The easement holder possesses the dominant tenement, while the owner of the land against which the easement exists possesses the servient tenement."); Morris, 273 So. 3d at 179 ("The holder of an appurtenant easement 'possesses the "dominant tenement "while the owner of the land against which the easement exists possesses the "servient tenement." A "dominant estate" is the estate that receives the benefit of an easement.'"); Div. of Admin., Dept. of Transp. v. Ely, 351 So. 2d 66, 68–69 (Fla. 3d DCA 1977) ("Such a service and easement agreement creates an easement in gross personal to the company and not appurtenant because the easement is unsupported by another dominant estate held by the company which the easement benefited."); but see Devino v. 2436 E. Las Olas, LLC, 306 So. 3d 118 (Fla. 4th DCA 2020) (deeming easement appurtenant, although dominant parcel was owned by husband and wife and easement was granted to husband only).

**IV.**

With these principles in mind, we now turn to this case. American Properties initially owned all the subject properties. Mezey created Tamiami Sports—*a separate and distinct corporate entity*.[4] American Properties then granted Tamiami Sports easements on the El Lago property. At that time, American Properties owned the El Lago property and Parcels 17-21. Tamiami Sports never owned or later acquired any property. Thus, Tamiami Sports was a stranger to the purported dominant estate—Parcels 17-21.

These circumstances show that the easements are not connected to a dominant estate. N. Dade Water Co., 114 So. 2d at 461. The holder of the easement did not own the dominant tenement. See Tampa & G.C.R. Co., 74 So. at 298; Dianne, 84 So. 3d at 429; Morris, 273 So. 3d at 179; Div. of Admin., Dept. of Transp., 351 So. 2d at 68–69. Thus, an easement appurtenant never comes into existence.

---

[4] We reject PAJ's attempts to have us pierce the corporate structures of the entities involved. Even though Mezey was a principle or owner in these companies, they all retained a separate legal status under Florida law. See generally Mayer v. Eastwood-Smith & Co., 164 So. 684, 687 (Fla. 1935) ("'So long as proper use is made of fiction that corporation is entity apart from stockholders, fiction will not be ignored.'"); Lipsig v. Ramlawi, 760 So. 2d 170, 187 (Fla. 3d DCA 2000) ("Moreover, even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained."). As a result, Tamiami Sports is separate and distinct from American Properties, or any other successor of interest to Parcels 17-21.

In support of its position, PAJ focuses primarily on the broad wording of the easement. For instance, it argues that inclusion of the Grantee's "successors and assigns" shows the rights are not limited to the original grantee. At common law, easements in gross were not transferrable. See Ackroyd, 138 Eng. Rep. at 77. However, most states, including Florida, now allow transfer of easements in gross—especially those that are commercial in character, such as this. See, e.g., Dunes of Seagrove Owners Ass'n, Inc., 180 So. 3d at 1212; 3 Tiffany Real Prop. § 761 (3d ed.); Bruce & Ely, supra, at § 9:5; Crane v. Crane, 683 P.2d 1062, 1066 (Utah 1984). As a result, inclusion of words of inheritance or assignment do not necessarily create an easement appurtenant.

Likewise, PAJ directs us to the word "indenture." However, we find this of no import. At the time of the creation of the easements, the original public meaning of the word indenture simply meant a deed between two people with corresponding obligations. See Black's Law Dictionary 693 (5th ed. 1979) ("A deed to which two or more persons are parties , and in which these enter into reciprocal and corresponding grants or obligations towards each other."); The American Heritage Dictionary of the English Language 668 (1979) ("A deed or contract executed between two or more parties."). Thus,

the definition could equally apply to both types of easements and is not dispositive.

Similarly, PAJ focuses on the easement being "nonexclusive." But exclusivity concerns the scope of the easement—not whether the easement is appurtenant or in gross. "An exclusive easement is one for the sole benefit of the easement holder and excludes use thereof by the grantor servient owner. A non-exclusive easement, on the other hand, permits use by the servient owner." Gelfand v. Mortgage Inv'rs of Washington, 453 So. 2d 897, 898 (Fla. 4th DCA 1984) (citing R. Boyer, Florida Real Estate Transactions § 23.04).

Based on the above, we find that the easements are in gross. Since it did not own Parcels 17-21, Tamiami Sports' rights were not connected to a dominant estate. See Bruce & Ely, supra, at § 2:3 ("Where an easement does not benefit the owner of a particular tract, it is in gross."). Tamiami Sports was a stranger to Parcels 17-21.

Even though easements in gross are not favored by the common law and the courts of this state, we cannot ignore the fact that one of the necessary elements of easements appurtenant is missing. Without this necessary element, an easement appurtenant never arises. The broad-

21

sweeping language in the easements does not change this fact.  Accordingly,

we affirm the trial court's involuntary dismissal of this case.

     Affirmed.